

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

## No. 02-20-00208-CV

_____


IN THE INTEREST OF E.D. AND E.D., CHILDREN

---

On Appeal from the 324th District Court
Tarrant County, Texas
Trial Court No. 324-633191-18

---

Before Bassel, Womack, and Wallach, JJ.
Memorandum Opinion by Justice Womack

# MEMORANDUM OPINION

## I. INTRODUCTION

Father[1] appeals the trial court's June 19, 2020 "Order in Suit Affecting the Parent–Child Relationship." The crux of Father's complaints arise out of the fact that the trial court conducted the trial on October 10, 2019, but waited for more than eight months to sign a written order and that the written order (1) deviates from the trial court's oral rulings at the October 10, 2019 trial, (2) relies on developments occurring after October 10, 2019, and (3) places a very restrictive geographic limitation on Father that neither Father nor Mother requested. Because (1) written rulings control over oral rulings, (2) the trial court did not condition its ruling on later contingencies, and (3) the geographic restriction had both a factual and rational basis, we overrule Father's three issues and affirm the trial court's judgment.

## II. BACKGROUND

Father and Mother were in a relationship from about 2011 until 2016 but never married. During that time, they had two children, Edward and Ella. After Father and Mother separated, they co-parented and split the time that the children spent with each parent about equally.

---

[1]We use aliases to identify the children, and we identify family members by their relation to the children. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

## A. Father's Concern about Mother's First Boyfriend

In late 2017, Father began to have concerns about the man that Mother was dating. Father learned that Mother's boyfriend had an active protective order, so he texted her, and Mother responded that she was not aware of the protective order but that she was concerned. Father's impression after talking with Mother was that Mother was going to make her boyfriend move out, but a couple of days later, her boyfriend was back in her house when the children were present.

Father filed an original petition on January 22, 2018, and Mother filed her answer on February 20, 2018, and her counterpetition on February 23, 2018. The problem resolved itself when Mother and her boyfriend stopped seeing each other. Father and Mother agreed to continue with the half-and-half arrangement, and the trial court signed an agreed order on September 6, 2018, with possession for each parent on alternating weeks.

## B. Father's Concern about Mother's Second Boyfriend

In June 2018, Mother began dating another man, John Smith.[2] Shortly after Thanksgiving, Father had new concerns when the children reported that they had witnessed Smith physically abuse Mother. The children were worried about Mother's safety and concerned that she might have been hurt. When Father spoke to Mother about getting hurt, Mother attributed the injury to a scooter accident.

---

[2]We use an alias for Mother's boyfriend.

## C. The November 2018 CPS Investigation

Despite Mother's explanation, believing that the children had witnessed domestic violence, on November 28, 2018, Father reported the incident to Child Protective Services. During the CPS investigation, Mother denied any domestic violence, and although Mother was offered counseling, she declined. Unable to substantiate any domestic violence, CPS ruled out the allegations.

## D. The February 9, 2019 Incident—First Strangulation

A few months later, on February 9, 2019, Mother, the children, and Smith were at a Chick-fil-A when Smith became upset with Mother, so Smith left, stranding Mother and the children at the Chick-fil-A. After getting a Lyft ride home, Mother dropped the children off at a neighbor's and then went to her house, where Smith strangled her and then tried to suffocate her with a pillow.

## E. The February 19, 2019 Rule 11 Agreement

Ten days after Smith had strangled and attempted to suffocate Mother, on February 19, 2019, Father and Mother filed a "Rule 11 Agreement for Final Settlement." Father and Mother continued the weekly alternating possession schedule with a modification to the summer schedule, during which possession would alternate bi-weekly instead of weekly. Father agreed that because CPS had ruled out the

allegations[3] and because the person working on the case had not been able to find anything that would substantiate the domestic violence concerns, he and Mother entered into a Rule 11 Agreement in which the half-and-half arrangement with Mother continued.

## F. Mother's Application for a Protective Order in March 2019

In early March 2019, Mother sought a protective order against Smith. Although the application provides spaces to list multiple persons who needed protection, Mother listed only herself. Mother made her application on March 7, 2019, after Smith had attempted to take her keys and lock her in her house, but she managed to escape. In the application itself, Mother relied on the incident that had occurred on February 9, 2019. She also mentioned another instance of domestic violence that had occurred on December 25, 2018, when Smith had punched her in the back. On the written form, when asked to describe Smith's relationship to Mother, she wrote, "Boyfriend."

## G. CPS's March 2019 Investigation

Meanwhile, in late March 2019, CPS opened another investigation after receiving a referral from a source other than Father. This new referral alleged that domestic violence and drug use were occurring in the children's presence. The CPS

---

[3]Contextually, Father appeared to be referring to the November 2018 allegations because Father's other testimony suggested that it was not until April 2019 that he learned about the February 9, 2019 incident.

investigator, Kimara Burnside, knew about the earlier November 2018 investigation. Burnside reported that Mother denied that any domestic violence had occurred, denied any drugs had been used in the home, and asserted that she and Smith were not in a relationship at that time. Having no evidence to support the allegations of domestic violence and drug use in the home around the children, CPS ruled out the March 2019 allegations.

Burnside testified that she was not aware of Mother's March 2019 report to the police in which Mother had alleged that Smith had tried to strangle her in February 2019 and, further, that Mother had not shared that information with her. Similarly, Burnside did not recall hearing about a December 25, 2018 assault either, but she stated that if CPS had known about it, CPS would not have closed the case.

## H. The April 13, 2019 Incident—Second Strangulation

Mother's saga with Smith had not ended. She met with Smith again in April 2019, and this time Smith nearly killed her.

Fort Worth police officer Cory Clackler testified that he responded to a burglary call at Mother's house on April 13, 2019. When he arrived, a neighbor identified the burglar as Mother's ex-boyfriend, whom the police later identified as Smith. Once Mother arrived at the scene, she reported that she had met with Smith at a school to talk but that Smith had become angry and had tried to strangle her using a dog leash. Mother said that she had willingly met with Smith that day. Because Smith had a felony warrant and because Mother asserted that Smith likely

6

had a gun with him, the on-site officers called the Special Response Team. After about an hour, Smith surrendered to the police, and the police arrested him for the already existing felony-strangulation warrant and for a new charge of assault family violence with strangulation based on what Mother had told the police at the scene.

Officer Justin Henry, who also responded to the burglary call, stated that domestic violence can be very damaging to children regardless of whether they are the victims of the violence. However, Officer Henry asserted that the children were not present at the scene.

## I. Father's Belated Knowledge of the February 9, 2019 and April 13, 2019 Incidents

In April 2019, Father gained access to police reports showing that Smith had assaulted Mother on February 9, 2019—a date on which Mother had possession of the children. Father had also heard that Smith was using drugs around the children, that Smith had engaged in significant domestic violence, and that the police had been called to Mother's home. Father thought that the domestic violence occurred on other occasions and that on some of those occasions the children were present, so he sought new temporary orders.

## J. The April 22, 2019 Rule 11 Agreement

On April 22, 2019, Father and Mother filed a Rule 11 Agreement in which Father had the right to designate the children's primary residence within Tarrant County and its contiguous counties and in which Mother had the right of possession

7

on Saturdays and Sundays, beginning at 10:00 a.m. and ending at 6:00 p.m. each day, following the first, third, and fifth Fridays of each month. Mother was not required to pay child support.

## K. The July 22, 2019 Agreed Temporary Order

A few months later, on July 22, 2019, the trial court signed an agreed temporary order that largely followed the April 22, 2019 Rule 11 Agreement. Father had the exclusive right to designate the children's primary residence within Tarrant County, and Mother's visitation was limited to Saturdays and Sundays, beginning at 10:00 a.m. and ending at 6:00 p.m. on each day, following the first, third, and fifth Fridays of each month. Additionally, the trial court ordered Mother to participate in no less than twelve counseling sessions at SafeHaven and to pay child support on the first day of each month.

## L. Smith's Indictment

A grand jury indicted Smith on July 25, 2019, for assault family violence by impeding breathing or circulation, a third-degree felony carrying a punishment range of imprisonment for not more than ten years or less than two years and a fine not to exceed $10,000. *See* Tex. Penal Code Ann. §§ 12.34, 22.01(b)(2)(B). The record further shows that Smith was offered a plea bargain of three years in the penitentiary on August 23, 2019, but the record does not show whether Smith accepted it.

**M. Mother's Testimony at the October 10, 2019 Trial**

At the October 10, 2019 trial, appearing pro se, Mother testified that she had taken the SafeHaven counseling sessions and understood them. She said that the first time that Smith had assaulted her was at Christmas when he punched her in the back. She admitted lying in her January 2019 answers to interrogatories when she denied ever having been a victim of domestic violence.

Mother related that the next time that Smith assaulted her was in February. Mother acknowledged that on February 9, 2019, the night that Smith had almost killed her, the children, who had been at the neighbors, returned home and that Smith spent the night there. She also acknowledged that even after February 9, Smith continued to live at her home, although she added that Smith worked out of town.

Mother admitted that about a month later, on March 7, Smith had taken her keys and had tried to lock her in the house to prevent her from leaving. As noted earlier, March 7 was the date on which Mother sought a protective order. And Mother conceded that she had told the police that Smith used drugs, but she qualified that admission by asserting that Smith had not used drugs around the children.

Mother asserted that as part of the November 2018 investigation, CPS did not require her to take any counseling. On the other hand, Mother acknowledged that CPS had wanted her to take counseling for domestic violence, but she had declined because she did not think that she needed any. Mother averred that she complied with the safety plan—Smith was not allowed to live in the home and was not allowed

9

to be around the children without supervision. And regarding the late March CPS investigation, Mother contended that she had told Burnside about Smith's February 2019 assault.

Mother denied that Smith's violence endangered the children:

> Q. Okay. Did you think that [Smith] posed a danger to your children?
>
> A. No. He was never violent to them. He -- if you ask my kids to this day, they love [Smith].
>
> Q. Do you think that his violent tendencies pose a danger to your children?
>
> A. No.
>
> Q. Do you think his domestic violence with you poses a danger to your children?
>
> A. No. He --
>
> THE REPORTER: I'm sorry, ma'am?
>
> THE WITNESS: He poses a danger to me.

When the question of whether Smith endangered the children was revisited, Mother initially denied that he posed a danger but later relented and agreed that he did:

> Q. Okay. If I understand your testimony from earlier, you said you don't believe that Mr. [Smith] posed a danger to your children because of the domestic violence, because it didn't -- he didn't hit the children?
>
> A. He did not harm my children, no, ma'am.

Q. Do you think that his domestic violence with you poses a danger to the children?

A. He did not harm my children.

Q. My question is: Do you think that hi[s] abusing you posed a danger to your children?

A. No.

. . . .

Q. (BY [FATHER'S COUNSEL]) My question is this: If somebody that you're dating in the future punches you in the face, as long as that person's not hurting your children, you don't believe that that poses a danger to them; is that right?

A. I -- I don't -- I guess so, yes. I don't -- yes. I mean I do not want them around my children, no. I don't want them around my children.

Q. Do you believe -- my understanding from your testimony beforehand is that you said that you knew that Mr. [Smith] used drugs, but that it wasn't something that endangered your children because he wasn't doing it around the kids; is that right?

A. I -- he wasn't doing it around my children. I don't think it harmed my children. I mean I don't think it's a good thing to do around children period.

. . . .

Q. (BY [FATHER'S COUNSEL]) Did Mr. [Smith] pose a risk to your children because he did --

A. Yes.

Q. -- drugs?

A. Yes. He posed a risk to my children, yeah.

11

Q. (BY [FATHER'S COUNSEL]) So Mr. [Smith] did pose a risk to your children?

A. Yes. Yes, he did.

Q. Because he used drugs?

A. Yes.

Q. And you admit that you knew for months that he was actively using drugs?

A. Yes.

Q. And that he was living in the home with you?

A. Yes.

Q. And that he was staying there when the children were there?

A. Yes.

Q. Is that different from the testimony you gave before lunch?

A. I believe so, yes.

Q. Do you think that you need counseling to deal with the issues of the domestic violence?

A. I have been through SafeHaven counseling.

. . . .

Q. (BY [FATHER'S COUNSEL]) Do you need counseling because of the domestic violence that occurred?

A. No, ma'am. I've already been through it.

12

## N. Mother's Father and Brother

In addition to concerns about Smith, concerns arose about Mother's father and brother—both were felons. Mother stated that her father went to prison for five years in July 2019 for embezzling money and that his criminal history included a DWI and domestic violence. As for Mother's brother, she testified that he was out on parole and that he sometimes spent the night at her home. Her understanding was that her brother had been convicted of perhaps four DWIs and possibly of theft or fraud.

An admitted exhibit showed that Mother's father was convicted of theft of government funds in May 2019 and received a sixty-month sentence. His criminal history included a conviction for misdemeanor harassment, four misdemeanor convictions for assault causing bodily injury to a family member, a state-jail felony conviction for possession of a controlled substance under one gram, a misdemeanor conviction for obstructing a highway, two misdemeanor convictions for interfering with an emergency request for assistance, a misdemeanor conviction for criminal trespass, and a misdemeanor conviction for theft of services of more than $20 but less than $200.

Another exhibit admitted at trial showed that Mother's brother had been paroled for a third-degree DWI conviction. His other convictions included a third-degree felony for fraudulent possession of a controlled substance and a misdemeanor for a false alarm or report.

Mother acknowledged that her brother's fiancée also sometimes spent the night and that her brother's fiancée had a theft conviction. Mother agreed to make her brother and his fiancée leave her home if that became necessary.

## O. Domestic Violence and Children

At the October 2019 trial, CPS Investigator Burnside explained why domestic violence endangers children:

> Well, for one, we look at the fact that a child could be injured if they're in the presence of the domestic violence; and . . . two, it affects them . . . when they get older[;] they never forget that this has taken place. Not to mention they sometimes take [on] those behaviors themselves in their relationships. Because that's what they see[, they learn] that that's how they should handle it being children.

## P. Father's Position at Trial

At the October 10, 2019 trial, Father acknowledged that Mother was a good parent and would not hurt her children. Father's concern was that Mother was bringing men around the children who could jeopardize the children's safety. Because of that, Father wanted Mother to have the children on only the first, third, and fifth weekends with no overnights.

## Q. The Trial Court's October 10, 2019 Oral Rulings

After both Father and Mother rested and closed, and after hearing the parties' final arguments, the trial court stated that Mother needed additional counseling:

> This is a difficult case in that by all accounts, you are a great mom. And by all accounts, you're an active mom. And by all accounts, you are the mom that I think most children should have.

14

My concern, though, ma'am, is your . . . continuing lack of insight as to what the effects of family violence on you or the effects of the drug usage, even if the children aren't around, on your children. . . .

. . . But [Smith] almost killed you at least twice it sounds to me like. He -- you almost died.

. . . .

I want you to go to more counseling. And I want -- I don't want this to last -- I want you to get back to at least -- at least overnight visitations, and maybe even more than that later on down the road. . . .

. . . .

I'm going to make a partial order here. I'm going to order that y'all remain as joint managing conservators. I'm going to order that [Father] be the -- and I use this term advisedly, but the primary conservator. That he have the right -- the exclusive right to consent to medical, dental, and surgical treatment involving surgical intervention; the exclusive right to consent to psychiatric and psychological treatment; the exclusive right to make educational decisions, all after consultation, meaningful consultation, or reasonable consultation with mom.

. . . .

I'm going to consider the visitation. I'm going to consider the child support. I'll send a rendition out to the two of you by e-mail, [Father's counsel] and [Mother].

I'm also going to order more counseling. I'll contact -- I will make some decision on that. I'll contact -- I'll just be straightforward with you. I'll contact SafeHaven and see what else they have to offer you. I want to make it as cheap as possible for you. I want more counseling.

I want the counselor to decide -- maybe your children need to participate at some point in time, but I'll let the counselor decide that. [Father], the counselor may want to talk to you. I want you to participate if that's the case. But I want you to cooperate for sure. If the counselor says I want the children there and you have possession of the

15

children, then I want you to make sure the children are there. And y'all need to coordinate. I know you've both got work schedules, work around work schedules. I want you to help out on this.

. . . .

Once I send it to you, [Father's counsel], I'll ask that you prepare an order and present it to the Court with a ten-day letter to [Mother]. And by that, [Mother], I mean that she'll send the order to you. If you believe that it conforms with what my orders are, you're to sign it and send it back to [Father's counsel]. And then I'll sign it. And then you can get a conformed copy of the order if you'd like.

## R. The Trial Court's November 6, 2019 Email

About a month later, on November 6, 2019, the trial court sent by email a letter to the parties with its rulings:

Please accept this letter as a rendition and not as a final order.

Mom is ordered to attend and participate in the DVA Awareness Group as well as the SOAR support group at SafeHaven. Mom is ordered to attend the support group until such time as she is released by a counselor or until April 30, 2020[,] whichever comes first. I anticipate that by May 1, 2020, Mom would be able to show that she no longer is seeing Mr. [Smith] or anyone else of his ilk.

. . . .

The parties are ordered to be joint managing conservators of the children. . . . [CR 198.]

Mom is ordered to pay child support in the amount of $1,240.00 per month with payments due and payable on [the first of each month]. Beginning on May 1, 2020, neither party is ordered to pay child support.

Until April 30, 2020, Mom is ordered to have possession of the children at all times as the parties may mutually agree. Absent agreement, Mom is ordered to have a standard possession period.

16

Beginning on May 1, 2020, the parties are ordered to have a week on/week off possession schedule with Mom having possession of the children from May 1, 2020 either after school or at 6:00 p.m. until Friday, May 8, 2020, either after school or until 6:00 p.m. Dad is ordered to have possession of the children from either after school or at 6:00 p.m. on May 8, 2020 until after school or 6:00 p.m. on May 15, 2020. The parties are then to alternate week on/week off possession schedules. The parties are to have a standard holiday possession schedule as well as a standard summer possession schedule. The week on/week off possession schedule shall not be recalculated after each holiday or summer possession.

. . . .

Neither party is ordered to have the exclusive right to establish the primary residence of the children. However, the parties are ordered to maintain the residence of the children in the children's current school district and within a five-mile radius of the oldest child's current school unless the parties agree in writing otherwise.

. . . .

[Father's counsel], please prepare an order and present it to the Court within 30 days with a 10[-]day letter to [Mother].

## S. Father's Motion for Clarification and Reconsideration and the December 2, 2019 Hearing

On November 18, 2019, Father filed a "Motion for Clarification and Reconsideration of Final Rendition." The trial court heard Father's motion on December 2, 2019. At that hearing, the trial court explained that its October 10, 2019 ruling was temporary so that Mother could have the opportunity to take additional counseling:

Well, I ordered that [Father] should have those rights I think till May the 1st. And I want [Mother] to go to the classes and the programs they have there at SafeHaven. And so I meant for -- I meant for him to

17

have those rights until then. And then I meant for them to have the rights as set forth in my rendition letter after that.

Father complained that Mother had already been ordered to attend counseling at SafeHaven and had not complied and that the order was backwards, that is, the trial court was granting relief on the assumption that Mother would attend counseling at SafeHaven and that if Mother did not, the burden would fall on Father to go to court to change the status quo.

The trial court responded by indicating that it had no interest in ruling before Mother had been given another opportunity to attend counseling at SafeHaven:

> Well, here's my concern: One, if you would like, I could order that they -- at least something to consider, I'm not sure you would like it. Something that I could consider would be to have everybody come back the last week of April to see if she's completed all of those classes. I was trying to avoid additional attorney's fees for [Father].
>
> And I'm maybe presuming too much, but I presume that [Mother] will complete the classes. But if -- I will just say if you would rather that we just go to -- have a reconsideration -- not a reconsideration, but just another hearing at the end of April to see how [Mother] is doing, I would be happy to do that and make my orders at that time.

Because the hearing was on December 2, 2019, an April setting was effectively at least four months away. Father argued that the trial court should make its decision based on what it had heard on October 10, 2019, and not on what it might hear later.

The trial court again responded that it wanted to give Mother another chance:

> But I -- I really think that it's right to give her a chance to show that she can do what she's supposed to do. She's been an active -- she's been a good mom in my opinion. Even dad said she's been a good

18

mom. I think she got in a really bad relationship with this man. And I think she did not know how to get out of that relationship. And she acted inappropriately in getting out of the relationship.

But I want, for the children's protection and for, hopefully, I thought [Father's] comfort level, to give her a chance to finish up the session groups and to try to go -- to move on down -- further down the road. And, hopefully, she will never get herself into that situation again, you know.

Father persisted and argued again in favor of ruling on what the trial court had already heard:

[FATHER'S COUNSEL]: I guess my position, Judge, is that I think four and a half months when she was represented by counsel to do those same things, and then coming to trial and those things hadn't been done, I think that that's sufficient. I just know that based upon what has already occurred, I think that they're -- all we're going to do is relitigate the situation.

The trial court, however, stood its ground:

Again, I'm going to let you choose. I'm happy with the ruling that I made. I mean sure, it could go backwards. But if [Father] or you would feel more comfortable in just saying, okay, we'll leave the first part of that ruling in place and reset this for the end of April to see how she's doing, and then I'll make the final part of the ruling, which I'll just tell you I will make that ruling if it appears that she's complied with my other orders. And I'll do it that way.

Near the close of the hearing, the trial court indicated that it would defer to Father about how to proceed: "I'm going to let [Father's counsel] talk to her client about whether or not [Father's counsel] wants to leave [my November 2019 ruling] in place or whether or not she wants to have a review type hearing at the end of April and see how you're doing."

19

## T. Mother's SafeHaven Counseling

At the December 2, 2019 hearing, Father's counsel argued against giving Mother more time to receive counseling. Father's position was either that Mother had not received any counseling before the October 10, 2019 trial or that she had already been given sufficient time to receive the necessary counseling.[4]

Regarding the SafeHaven counseling, as provided in the July 22, 2019 temporary order, Mother was supposed to "sign a HIPAA Release to permit each attorney of record to receive a copy of the therapy notes and to speak with the therapist within fourteen (14) days of beginning this therapy." At the trial, Mother stated that she had signed a HIPAA release but had not been aware that she was supposed to have done anything else.

Father's trial testimony showed that Mother had notified him on the day of trial that she had been attending the SafeHaven counseling and had completed it. Despite that, because Mother had concealed the domestic violence from CPS, Father stated that he was concerned that Mother might not have disclosed the full extent of the domestic violence to a therapist.

---

[4]At the October 10, 2019 trial, Mother testified that she had taken the SafeHaven counseling, and she attempted to introduce SafeHaven counseling records into evidence, but Father objected because Mother had not authenticated the documents, produced them in discovery, or complied with the trial court's June 2019 order requiring her to provide a HIPAA release so that Father could have access to the counselor. The trial court sustained Father's objection. Mother did not make an offer of proof. *See* Tex. R. Evid. 103(a)(2).

20

## U. Three Documents Filed on March 6, 2020

On March 6, 2020, three documents were filed in the trial court. One is a certificate awarded on December 3, 2019, showing that Mother had completed SafeHaven's "Domestic Violence Psychoeducation Group." This document would not have been available for both the October 10, 2019 trial and the December 2, 2019 hearing, and whether this certificate is for counseling received before or after the October 10, 2019 trial is not clear. A second document is a certificate dated October 26, 2019, showing that Mother had participated in New Day Services' "Access Without Conflict" class, and the third is a certificate awarded on February 18, 2020, showing that Mother had participated in New Day Services' "Focus For Mothers" class. These documents were never introduced into evidence.

## V. The Trial Court's June 19, 2020 Written Order

More than six months after the hearing on Father's motion for clarification, the trial court signed an order on June 19, 2020. The order referenced two prior dates: (1) as "judicially PRONOUNCED and RENDERED . . . on October 10, 2019" and (2) as "further noted on the court's docket sheet on November 6, 2019."[5]

---

[5]The record does not contain a docket sheet entry for November 6, 2019, but does contain the trial court's November 6, 2019 email to the parties.

### 1. Conservatorship and Possession Through April 30, 2020

Under the heading, "*Conservatorship Beginning November 6, 2019 until April 30, 2020*," the trial court appointed Father and Mother as joint managing conservators. Father had the exclusive right to designate the primary residence of the children within five miles of the children's elementary school. The order added,

> IT IS ORDERED that the primary residence of the children shall be within a five mile radius of [the children's current elementary school] and the parties shall not remove the children from within a five mile radius of [the children's current elementary school] for the purpose of changing the primary residence of the children until this geographic restriction is modified by further order of the court of continuing jurisdiction or by a written agreement that is signed by the parties and filed with that court.

Thereafter, under the heading "*Possession and Access until April 30, 2020*" and the subheading "Standard Possession Order," the trial court ordered that Mother had the right of possession on the first, third, and fifth Friday of each month starting at 6:00 p.m. and ending the following Sunday at 6:00 p.m., and during the regular school year, it also ordered that Mother had possession each Thursday from 6:00 p.m. until 8:00 p.m.[6] The trial court ordered Mother to attend and participate in the "DVA Awareness Group" as well as the "SOAR support group" at SafeHaven until

---

[6]This is a standard possession order for parents residing 100 miles or less apart. *See* Tex. Fam. Code Ann. § 153.312(a).

discharged by the counselor or until April 30, 2020.[7]  Mother was also ordered to pay child support until April 30, 2020.

## 2. Conservatorship and Possession Starting on May 1, 2020

Under the heading "*Conservatorship Beginning May 1, 2020*," the order states, "The Court finds that beginning May 1, 2020 without further Court hearing or intervention, the following orders are in the best interest of the children."  Father and Mother were again appointed joint managing conservators, and Father continued to have the exclusive right to designate the primary residence of the children within a five-mile radius of their elementary school.  The language regarding the geographic restriction was repeated:

> IT IS ORDERED that the primary residence of the children shall be within a five mile radius of [the children's current elementary school] and the parties shall not remove the children from within a five mile radius of [the children's current elementary school] for the purpose of changing the primary residence of the children until this geographic restriction is modified by further order of the court of continuing jurisdiction or by a written agreement that is signed by the parties and filed with that court.

Under the heading, "*Possession and Access Beginning May 1, 2020*," Mother's right of possession was changed and was expanded to every other week.  Because the parties had equal periods of possession, the trial court did not order either party to pay child support.

---

[7]Although unclear, "DVA" and "SOAR" appear to refer to "Domestic Violence Advocacy" and "Survivors Overcoming Abusive Relationships" respectively.

### 3. Injunctive Relief

Under the heading, "*Injunctive Relief*," the trial court enjoined Mother from "[a]llowing the children to be in the presence of a known felon, unless that felon is a family member," and if the felon was a family member, Mother was "ordered to supervise that access at all times." The trial court specifically enjoined Mother from having any contact with Smith. Not stopping there, the trial court further enjoined Mother from "[a]llowing the children to be in the presence of anyone with an active protective order or felony arrest." Should Mother have any contact with Smith, the order contained a warning: "The Court admonishes Mother that should credible evidence be presented that she is even in contact with Mr. [Smith], her access to the children will be greatly reduced."

## III. DISCUSSION

### A. Father's First Issue

In Father's first issue, he complains that the trial court's November 6, 2019 email ruling and its June 19, 2020 order deviated from its October 10, 2019 oral ruling: "The trial court erred in deviating from its oral pronouncement of conservatorship to its written rendition and . . . the entry of a written judgment incorporating same resulted in an improper judgment."

"A written judgment or order will control over a trial court's oral pronouncement." *In re A.N.G.*, 631 S.W.3d 471, 483 (Tex. App.—El Paso 2021, no pet.). A trial court's later written rulings supersede earlier oral pronouncements. *See*

24

*Kaur-Gardner v. Keane Landscaping, Inc.*, No. 05-17-00230-CV, 2018 WL 2191925, at *4 (Tex. App.—Dallas May 14, 2018, no pet.) (mem. op.); *Carter v. Lavergne*, No. 05-09-00333-CV, 2010 WL 2880211, at *3 (Tex. App.—Dallas July 23, 2010, no pet.) (mem. op.); *Gasperson v. Madill Nat'l Bank*, 455 S.W.2d 381, 387 (Tex. App.—Fort Worth 1970, writ ref'd n.r.e.); *cf. In re K.F.*, No. 02-21-00056-CV, 2021 WL 5742239, at *5 (Tex. App.—Fort Worth Dec. 2, 2021, no pet. h.) (mem. op.) (noting that trial court's oral statements do not substitute for written findings of fact).

We overrule Father's first issue.

## B. Father's Second and Third Issues

Father's second and third issues address custody and possession issues.

### 1. Standard of Review

We review the trial court's decisions on custody, control, possession, and visitation for an abuse of discretion. *In re M.M.M.*, 307 S.W.3d 846, 849 (Tex. App.—Fort Worth 2010, no pet.). To determine whether a trial court abused its discretion, we must decide whether it acted without reference to any guiding rules or principles or whether it acted arbitrarily or unreasonably. *Id.* A trial court does not abuse its discretion merely because the appellate court would have ruled differently in the same circumstances. *Id.*

Nor does the trial court abuse its discretion when it bases its decisions on conflicting evidence. *Id.* As long as some evidence of a substantive and probative character supports the trial court's decision, it does not abuse its discretion. *Id.*

25

The trial court is in a better position to observe and assess the witnesses' demeanor and credibility. *See In re A.L.E.*, 279 S.W.3d 424, 427 (Tex. App.—Houston [14th Dist.] 2009, no pet.). Consequently, we will not second guess the trial court but will defer to its credibility and factual determinations. *Id.*

When reviewing a ruling under the abuse-of-discretion standard, legal and factual sufficiency are not independent grounds of error but are relevant factors in deciding whether the trial court abused its discretion. *M.M.M.*, 307 S.W.3d at 849; *In re W.M.*, 172 S.W.3d 718, 725 (Tex. App.—Fort Worth 2005, no pet.); *In re T.D.C.*, 91 S.W.3d 865, 872 (Tex. App.—Fort Worth 2002, pet. denied) (op. on reh'g). In determining whether the trial court abused its discretion because the evidence is legally or factually insufficient to support its decision, we consider whether the trial court had sufficient information on which to exercise its discretion and whether it erred when applying its discretion. *M.M.M.*, 307 S.W.3d at 849; *W.M.*, 172 S.W.3d at 725; *T.D.C.*, 91 S.W.3d at 872. The traditional sufficiency reviews come into play when answering the first question, and when determining the answer to the second question, we ascertain whether, based on the elicited evidence, the trial court made a reasonable decision. *M.M.M.*, 307 S.W.3d at 849; *W.M.*, 172 S.W.3d at 725.

In determining legal sufficiency, we credit favorable evidence if a reasonable factfinder could and disregard contrary evidence unless a reasonable factfinder could not. *In re Marriage of Mitchell*, 585 S.W.3d 38, 47 (Tex. App.—Texarkana 2019, no pet.). The evidence is legally insufficient if:

- there is a complete absence of evidence of a vital fact;

- the rules of law or of evidence bar the court from giving weight to the only evidence offered to prove a vital fact;

- there is no more than a mere scintilla of evidence offered to prove a vital fact; or

- the opposite of the vital fact is conclusively established by the evidence.

*Id.*; *see T.D.C.*, 91 S.W.3d at 872. Less than a scintilla of evidence exists when the evidence is so weak as to do no more than create a mere surmise or suspicion of a fact. *Marriage of Mitchell*, 585 S.W.3d at 47.

When reviewing a finding for factual sufficiency, we consider all the evidence and will set aside a finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Id.*; *see T.D.C.*, 91 S.W.3d at 872, 874. When, as here, the trial court does not file findings of fact and conclusions of law, we imply that the trial court made all findings necessary to support the trial court's order. *Marriage of Mitchell*, 585 S.W.3d at 47.

## 2. Father's Second Issue

In Father's second issue, he argues that the evidence presented at the October 10, 2019 trial did not support the trial court's November 6, 2019 ruling and June 19, 2020 order and that the trial court predicated its November 6, 2019 ruling on anticipated materially and substantially changed circumstances occurring after the October 10, 2019 trial: "The trial court erred in preemptively ordering a post-trial

27

modification of conservatorship provisions and an equalized possession and access period, inconsistent with the evidence presented at trial, such that it amounted to a presumption of a material and substantial change in circumstances six months post-trial." Within his brief, Father elaborated that the trial court could have considered the completion of certain actions, such as engaging in counseling or attending domestic-violence-education classes, as sufficient to justify a modification action, but that was not what the trial court did. Instead, he argues, the trial court disregarded "the actual evidence presented at trial in favor of a presumptive change in [later] circumstances" and entered an order that the evidence neither legally nor factually supports. Father contends that the trial court ordered a prospective half-and-half possession schedule for May 1, 2020, without:

- knowing whether such a possession schedule on that date would be in the children's best interest,

- providing a mechanism for ensuring that Mother complied with the ordered additional services and—assuming Mother had completed the additional services—whether that was enough to show that the half-and-half schedule was in the children's best interest, and

- requiring Mother to show a material change in circumstances justifying the modified schedule.

Father concludes, "The Court's presumption that Mother would change her circumstances over the course of six months such that the Court would completely revise its prior judgment was an abuse of discretion."

28

### a. Possession-and-Access Schedules, Graduated Schedules, and Posttrial Contingencies

Regarding conservatorship, possession, and access, the primary consideration is always the child's best interest. *See* Tex. Fam. Code Ann. § 153.002; *Lenz v. Lenz*, 79 S.W.3d 10, 14 (Tex. 2002). A trial court may modify a possession-or-access order if it finds that modification would be in the child's best interest and, as it applies to this case, that the circumstances have materially and substantially changed since the previous order. Tex. Fam. Code Ann. § 156.101(a)(1)(A). A trial court is not confined to rigid or definite guidelines when deciding whether a material and substantial change of circumstances has occurred. *A.L.E.*, 279 S.W.3d at 428. The law does not prescribe a particular method, and circumstantial evidence may suffice. *Id.* at 429. The determination is fact and case specific. *See id.* at 428.

The standard possession order is presumably in the child's best interest, but that presumption is rebuttable. Tex. Fam. Code Ann. § 153.252; *In re J.J.R.S.*, 627 S.W.3d 211, 218 (Tex. 2021), *petition for cert. filed sub nom R.S.C. v. Tex. Dep't of Fam. & Protective Servs.*, (U.S. Dec. 1, 2021) (No. 21-6485); *Davenport v. Davenport*, No. 01-15-01031-CV, 2016 WL 7011406, at *4 (Tex. App.—Houston [1st Dist.] Dec. 1, 2016, no pet.) (mem. op.); *see* Tex. Fam. Code Ann. § 153.312 (setting out standard possession order for parents who reside 100 miles or less apart). "The guidelines established in the standard possession order are intended to *guide* the courts in ordering the terms and conditions for possession of a child by a parent named as a possessory

conservator or as the minimum possession for a joint managing conservator." Tex. Fam. Code Ann. § 153.251(a) (emphasis added).

A trial court can deviate from a standard possession order if following it would be inappropriate or unworkable. *Id.* § 153.253; *Syed v. Masihuddin*, 521 S.W.3d 840, 848 (Tex. App.—Houston [1st Dist.] 2017, no pet.). "The best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child." Tex. Fam. Code Ann. § 153.002; *Syed*, 521 S.W.3d at 847; *see Davenport*, 2016 WL 7011406, at *4 (citing Tex. Fam. Code Ann. § 153.252). The policy is to encourage frequent contact between a child and each parent for periods of possession that optimize the development of a close and continuing relationship between each parent and the child. Tex. Fam. Code Ann. § 153.251(b); *Davenport*, 2016 WL 7011406, at *4. When establishing terms and conditions of conservatorship, a trial court's determination of what is in the child's best interest is a discretionary function. *J.J.R.S.*, 627 S.W.3d at 218.

A graduated possession-and-access schedule can be in a child's best interest. *See Peterson v. Kirk*, No. 03-02-00202-CV, 2002 WL 31833710, at *6 (Tex. App.—Austin Dec. 19, 2002, pet. denied). In *Peterson*, the court wrote that "[b]ecause the trial court found that a standard possession order would not be appropriate, it ordered a graduated visitation schedule, beginning with telephone calls, then visits in the children's home state, ultimately graduating to a standard possession schedule as provided by the family code." *Id.* The court added that "the schedule ordered by the

30

court allows the children, who have had minimal contact with their father in the past seven years, an opportunity to establish a relationship with him in a familiar setting before traveling a significant distance to a strange place to visit him." *Id.*

Graduated schedules that are contingent on intervening events can, however, encounter difficulties. *See J.A.S. v. A.R.D.*, No. 02-17-00403-CV, 2019 WL 238118, at *7 (Tex. App.—Fort Worth Jan. 17, 2019, no pet.) (mem. op.) ("Because the stair-up provisions are ambiguous, they are not enforceable by contempt."). *But cf. J.J.R.S.*, 627 S.W.3d at 223–24 ("[W]hile the Family Code provides that conservators may be subject to contempt for disobeying a court order, the Code does not require—nor have we ever held—that trial courts must issue orders that are always enforceable by contempt." (citation omitted)). *See generally Stewart v. USA Custom Paint & Body Shop, Inc.*, 870 S.W.2d 18, 20 (Tex. 1994) ("A judgment must be sufficiently definite and certain to define and protect the rights of all litigants, or it should provide a definite means of ascertaining such rights, to the end that ministerial officers can carry the judgment into execution without ascertainment of facts not therein stated."). But the trial's court order here is not contingent on any intervening events.

### i. The November 6, 2019 Email

The trial court's November 6, 2019 email was arguably contingent on Mother's conduct until May 1, 2020. In the email, the trial court wrote, "I anticipate that by May 1, 2020, Mom would be able to show that she no longer is seeing Mr. [Smith] or anyone else of his ilk."

31

We do not have to decide that issue, however, because the November 6, 2019 email was an interlocutory ruling. *See In re B.W.S.*, No. 05-15-01207-CV, 2016 WL 7163866, at *2 (Tex. App.—Dallas Nov. 28, 2016, no pet.) (mem. op.) (citing *inter alia Gulf States Utils. Co. v. Low*, 79 S.W.3d 561, 563, 565 (Tex. 2002)). The trial court has the power to set aside or revise interlocutory rulings any time before it enters a final judgment. *Fruehauf Corp. v. Carrillo*, 848 S.W.2d 83, 84 (Tex. 1993); *Maldonado v. Maldonado*, 556 S.W.3d 407, 413 (Tex. App.—Houston [1st Dist.] 2018, no pet.).

### ii. The June 19, 2020 Written Order

Turning to the trial court's June 19, 2020 written order, it does not predicate the May 1, 2020 change in possession on any intervening contingency. Just the opposite, the order recites that the changes in possession that occur on May 1, 2020, were to occur regardless of any intervening event: "The Court finds that beginning May 1, 2020 without further Court hearing or intervention, the following orders are in the best interest of the children."

### iii. Delay in Signing Order

Although the June 19, 2020 written order was not contingent on anything occurring after the October 10, 2019 trial, if a problem arose after the October 10, 2019 trial and before the trial court signed the June 19, 2020 order, the trial court was nevertheless in a position to act.

By not signing the written order, the trial court retained jurisdiction, and as long as it retained jurisdiction over the case, it retained the power to revise its orders.

32

*See Fruehauf Corp.*, 848 S.W.2d at 84; *Maldonado*, 556 S.W.3d at 413.  In that sense, the trial court's November 6, 2019 rulings were contingent—contingent on the trial court not changing its mind before it signed the final order—but they were contingent in a manner that the law recognizes.[8]

### b.  The Trial Record and the Trial Court's Later Rulings

Remaining is the question whether the evidence that the trial court heard on October 10, 2019, supports the trial court's judgment.

From April 19, 2019 until the trial court's November 6, 2019 email, Mother had been restricted to seeing her children only on Saturdays and Sundays following the first, third, and fifth Fridays of the month and, even then, only from 10:00 a.m. until 6:00 p.m.  Thereafter, Mother was to receive standard visitation, which the trial court's June 19, 2020 written order shows as possession on the first, third, and fifth Friday of each month starting at 6:00 p.m. and ending the following Sunday at 6:00 p.m.  During the regular school year, Mother also had possession each Thursday from

---

[8]The delay in signing the written order may not have been attributable to the trial court.  In the trial court's November 6, 2019 email, it instructed Father's counsel to prepare an order by December 6, 2019: "[Father's counsel], please prepare an order and present it to the Court within 30 days with a 10[-]day letter to [Mother]."  But instead of a proposed order, Father filed his motion for clarification and reconsideration, which led to the December 2, 2019 hearing, at which the trial court gave Father the option of how to proceed: "I'm going to let [Father's counsel] talk to her client about whether or not [Father's counsel] wants to leave [my November 2019 ruling] in place or whether or not she wants to have a review type hearing at the end of April and see how you're doing."  Regardless of the explanation, the record does not show that either party complained to the trial court about the delay.

6:00 p.m. until 8:00 p.m. And starting on May 1, 2020, Father and Mother resumed their half-and-half arrangement. This stairstep approach allowed a graduated return to the half-and-half arrangement that had previously worked but for the issue of Mother's boyfriends.

At trial, Mother testified that she had gone through the counseling sessions and had procured a protective order. Despite that, Mother's testimony suggested that she was reluctant to acknowledge that Smith's violence and drug use posed a danger to the children. Ultimately, she agreed that they did. And although Mother denied that she needed any more counseling, the trial court ordered Mother to take more. Father had no complaints with Mother's parenting but for Mother's choice in boyfriends, and the court-ordered counseling was designed to address that issue.

The immediate threat was Smith, and the evidence showed that Smith had been indicted and might be headed to prison. Regardless, the order enjoined Mother from having any contact with him.

The men that Mother was bringing around the children posed another potential danger. The order addressed that threat too by enjoining Mother from allowing the children to be around a known felon (other than family members) or anyone else with an active protective order or felony arrest.

In Father's brief, he correctly argues that the trial court had other means of addressing the problem. Specifically, he complains that the trial court put the burden on him to report Mother's noncompliance, whereas Father argued that Mother should

have been placed in the position of showing compliance before she was allowed greater possession.

As a general proposition, we agree with Father that the trial court had other ways of addressing the problem. We do not, however, conclude that the means that the trial court chose amounts to an abuse of discretion. *See Lenz*, 79 S.W.3d at 19 (acknowledging that evidence contrary to the jury's verdict existed but deferring to the jury's verdict because other evidence supported it).

Father also complains that the trial court placed too much faith in Mother. But the trial court faced the parties and their witnesses and observed their demeanor and was thus in a better position than an appellate court to evaluate Father's and Mother's claims. *See In re J.R.D.*, 169 S.W.3d 740, 743 (Tex. App.—Austin 2005, pet. denied). Furthermore, merely because an appellate court might have ruled differently as a matter of first impression does not mean that it can conclude that the trial court abused its discretion. *See E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995).

Although Mother did not present the strongest case, the record does not show that the trial court ruled in an evidentiary vacuum. The evidence showed that Mother had parented well in the past. The trial court was within its discretion to believe that Mother had completed counseling at SafeHaven before trial and, regardless of the counseling's efficacy, that she had at least made efforts to learn more about domestic violence. And given that Mother was devoted to her children, that Mother had only

standard visitation until May 1, 2020, and that Mother was paying child support while she had standard visitation, the trial court was within its discretion to believe that if it ordered Mother to attend additional counseling and prohibited her from bringing certain men—men with active protective orders, felony arrests, or felony convictions—around the children, Mother would comply. Because some evidence of substantive and probative character existed to support the trial court's decision, we hold that the trial court did not abuse its discretion. *See Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 211 (Tex. 2002).

We overrule Father's second issue.

### 3. Father's Third Issue

In Father's third issue, he complains that neither party requested the geographic restriction that the trial court imposed and that the evidence does not support the trial court's ruling: "The trial court erred in imposing an overly restrictive geographic limitation on the primary parent when the limitation was not pled for or tried by consent, and the evidence was factually and legally insufficient to support that the narrow restriction was necessary."

#### a. Applicable Law

Geographic restrictions, even if not expressly requested in the pleadings, fall within the ambit of conservatorship litigation. *See In re Marriage of Christensen*, 570 S.W.3d 933, 939–40 (Tex. App.—Texarkana 2019, no pet.); *see also* Tex. Fam. Code Ann. § 153.134(b)(1) (providing that when the trial court appoints joint managing

36

conservators, it shall designate which conservator has the right to determine the child's primary residence and "establish, until modified by further order, a geographic area within which the conservator shall maintain the child's primary residence" or "specify that the conservator may determine the child's primary residence without regard to geographic location."). Father's argument thus turns on whether the trial court abused its discretion by imposing the geographic restriction.

Texas does not have any specific statute regarding how to determine residency restrictions in custody cases. *See Lenz*, 79 S.W.3d at 14; *M.M.M.*, 307 S.W.3d at 850. In *Lenz*, the Texas Supreme Court addressed a variety of factors relevant to determining whether to modify a geographic restriction but not on how to initially set a geographic restriction. 79 S.W.3d at 14–16;[9] *cf. C.B. v. A.B.*, No. 02-19-00041-CV, 2020 WL 241382, at \*5–6 (Tex. App.—Fort Worth Jan. 16, 2020, no pet.) (mem. op.) (relying on the factors articulated in *Lenz* in the context of setting a geographic restriction when the mother testified that she wanted to move out of state).

---

[9]When the Texas Supreme Court decided *Lenz*, an arguably more restrictive version of Section 153.134(b) applied: "In rendering an order appointing joint managing conservators, the court shall: (1) establish the county of residence of the child until altered by further order, or designate the conservator who has the exclusive right to determine the primary residence of the child . . . ." Act of Apr. 6, 1995, 74th Leg., R.S., ch. 20, § 1, 1995 Tex. Gen. Laws 113, 150, *amended by* Act of May 19, 1999, 76th Leg., R.S., ch. 936, § 2, 1999 Tex. Gen. Laws 3674, 3674; *see Lenz*, 79 S.W.3d at 21 & n.2.

For purposes of initially setting a geographic restriction, the supreme court nevertheless provided some guiding principles:

> Family Code § 153.001 outlines [a basic] framework by pronouncing our public policy for all suits affecting the parent-child relationship:
>
> (a) The public policy of this state is to:
>
> > (1) assure that children will have frequent and continuing contact with parents who have shown the ability to act in the best interest of the child;
> >
> > (2) provide a safe, stable, and nonviolent environment for the child; and
> >
> > (3) encourage parents to share in the rights and duties of raising their child after the parents have separated or dissolved their marriage.
>
> .... We must endeavor to give meaning to these public policy imperatives as we interpret the Family Code . . . .

*Lenz*, 79 S.W.3d at 14; *see M.M.M*, 307 S.W.3d at 850 (citing Tex. Fam. Code Ann. § 153.001(a)). "Suits affecting the parent-child relationship are intensely fact driven, which is why courts have developed best-interest tests that consider and balance numerous factors." *Lenz*, 79 S.W.3d at 19. The child's best interest is always the primary consideration in resolving issues of conservatorship, possession, and access. *M.M.M.*, 307 S.W.3d at 850. "Given the many relevant factors, courts have explicitly rejected formulaic tests . . . ." *Lenz*, 79 S.W.3d at 19; *see M.M.M.*, 307 S.W.3d at 850.

### b. The October 10, 2019 Trial

At the October 10, 2019 trial, Mother testified,

I'm at my children's school . . . every single week. I'm there to eat lunch with them. Every time I walk in, . . . all of the kids know me by name. Even the teachers, they know everything about me. Every time I'm in the lunchroom, I'm there for my kids all the time.

During Mother's final argument, she said, "I moved into the neighborhood so that we could co-parent together. You know, just like I said that I go -- I'm always at the kids' school and I'm always involved. [Father] can't deny that I'm a great mother. I'm always there for my kids."

### c. The December 2, 2019 Hearing

During the December 2, 2019 hearing, the geographic restriction came up, but Father expressed no dissatisfaction with it:

> [MOTHER]: Your Honor, when it comes to . . . the primary residence, [Father] and I don't live very far from each other. And . . . whenever I left [Father], . . . I left [Father] and moved to Haslet. And then I moved back into Keller so we could have the perfect co-parenting opportunity. We don't live very far from each other.

> THE COURT: I restricted y'all from living very far from one another.

> [MOTHER]: And so -- yes. And I would love to . . . have that opportunity so that . . . our kids can go to the same school. . . . I printed out . . . how many times I go and eat lunch with my kids.

> THE COURT: I don't need that. I'm telling you I'm going to let him have the primary right to establish the residence of the children, but within the geographical area that I set forth in my letter.

> [MOTHER]: And what exactly does that mean?

> THE COURT: I don't remember now.

> [FATHER'S COUNSEL]: A couple of miles.

THE COURT: A five-mile radius or something like that.

### d. Discussion

As a preliminary matter, we note that Father presented no evidence suggesting that he planned to move. When the geographic restriction came up at the December 2, 2019 hearing, Father voiced no objection. *See J.A.S.*, 2019 WL 238118, at *8 ("[T]he evidence at trial proved that . . . neither [the father] nor [the mother] intended to relocate. On this record, we cannot say that the trial court abused its discretion by establishing a geographic restriction to [the counties that they lived in and the contiguous counties]." (footnote omitted)).

The record otherwise provided both a factual and rational basis supporting the geographic restriction. Mother would visit the children at their school, and if Father moved with the children, the move would potentially impact Mother's schooltime visits. Additionally, in the event domestic violence resurfaced in Mother's home, Father's residence would be relatively close to Mother's.[10]

In short, the geographic restriction assured that the children would have frequent and continuing contact with Mother regardless of whether it was her week to have possession, provided stability to the children's lives to the extent that Mother's school visits were part of their routine, insured that Father was relatively close in the

---

[10]At the time of trial in October 2019, Edward was seven years old and Ella was five years old.

event domestic violence reoccurred in Mother's home, and encouraged Father and Mother to share in the rights and duties of raising their children. *See Lenz*, 79 S.W.3d at 14 (citing Tex. Fam. Code Ann. § 153.001(a)). For parents with alternating weeks of possession, proximity arguably worked to the children's benefit. *See id.* at 19 (focusing on children's best interests). *See generally Morgan v. Morgan*, 254 S.W.3d 485, 490 (Tex. App.—Beaumont 2008, no pet.) ("[T]he trial court . . . balanced [the mother's] reasons for the move [against] the effects on the children's . . . relationships . . . with [their father and their extended family] and determined that it was in the children's best interest to reside within the geographical boundaries of the [children's current school district.]").

We overrule Father's third issue.

## IV. CONCLUSION

Having overruled Father's three issues, we affirm the trial court's judgment.

/s/ Dana Womack

Dana Womack
Justice

Delivered: January 6, 2022